**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHEN BUSHANSKY, derivatively on behalf of PLAYTIKA HOLDING CORP., | No. |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| ROBERT ANTOKOL, MARC BEILINSON, TIAN LIN, BING YUAN, HONG DU, DANA GROSS, AND JAMES FU BIN LU, | |
| Defendants, | |
| -and- | |
| PLAYTIKA HOLDING CORP., | |
| Nominal Defendant. | |

Plaintiff Stephen Bushansky, by his undersigned attorneys, brings this stockholder derivative action on behalf of nominal defendant Playtika Holding Corp. ("Playtika" or the "Company") against the members of the Company's Board of Directors for their breaches of fiduciary duties, violations of the federal securities laws, and other misconduct that resulted in material damage to the Company and its stockholders. These allegations are made upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief based upon the investigation and analysis by Plaintiff's counsel, including, among other things, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, transcripts of Playtika conference calls with financial analysts and investors, news reports, financial analyst reports, and other publicly available information about the Company. Plaintiff

believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.      This is a stockholder derivative action brought against the members of the Playtika Board of Directors (the "Board") for their violations of fiduciary duties and other misconduct, which resulted in substantial damage to the Company and its stockholders.

2.      Playtika, is a mobile gaming and technology company that offers popular free-to-play games on social networks and mobile platforms.

3.      Two of Playtika's earliest games–*Slotomania* and *Bingo Blitz*–have been the Company's most successful, netting nearly half of the Company's revenue in recent years. Therefore, it is essential to Playtika's core operations that developers in these two gaming studios continue to introduce new features and content to engage and retain daily users and attract new players.

4.      In statements to investors, the Company represented that it was dedicating sufficient resources to developing new features and content to keep users engaged. Indeed, Defendant Robert Antokol, Playtika's Board Chair and Chief Executive Officer ("CEO"), represented in an interview that the Company was "stable and growing," and prepared to offer new content and features on at least a bi-weekly basis.

5.      On May 11, 2021, Playtika provided the market with financial guidance of $2.6 billion in revenue and $1 billion in adjusted EBITDA for the year. However, less than six months later, the Company was forced to admit that it would not achieve that guidance. In a call with securities analysts and investors, the Company revealed that previously undisclosed costly and complicated infrastructure changes to its two top grossing games—*Slotomania* and *Bingo Blitz*—

diverted precious resources and interrupted the introduction of new features and content, upon which the Company's success depends. Based on the length and the complex nature of the projects, the Individual Defendants knew of the drastic changes long before its initial public offering of shares (the "IPO"), but failed to disclose the infrastructure changes to investors, despite the significant financial impact of those changes and the material damage caused to the Company by disseminating false and misleading or incomplete information to the market.

6.      Following the Company's disclosures, its stock dropped almost 25% in one day. On the heels of the stock drop, a securities class action was filed by aggrieved investors against the Company, several of the Individual Defendants, other Playtika executives, and the underwriters of Playtika's IPO (the "Securities Class Action"). As such, the Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself and its officers.

7.      As a result of the Individual Defendants' breaches of fiduciary duty and other misconduct, Playtika has sustained substantial damages and irreparable injury to its reputation. Through this action, Plaintiff seeks to recover for the Company its damages and remediate the internal control weaknesses that afflict Playtika.

8.      Plaintiff did not make a demand prior to bringing this action because it would be futile. The Company's directors are neither disinterested nor independent. In the absence of this action, Playtika will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.   JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder.

This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

10.     The Court has jurisdiction over each Defendant. Playtika does business in this District, which renders the Court's exercise of jurisdiction permissible under the traditional notions of fair play and substantial justice. The Individual Defendants, as corporate officers and/or directors of Playtika, have sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the wrongs took place in this District, the Individual Defendants transact business in this District, and the Individual Defendants' actions have had an effect in this District.

## III.   PARTIES

### A.   Plaintiff

12.     Plaintiff Stephen Bushansky purchased Playtika stock in the Company's IPO and has held Playtika common stock continuously since that time. As such, Plaintiff was a shareholder at the time of the transactions complained of herein.

### B.   Defendants

#### 1.   Nominal Defendant Playtika Holding Corp.

13.     Nominal defendant Playtika is a company duly incorporated under the laws of the State of Delaware. Its principal executive offices are located at HaChoshlim Street 8, Herzliya Pituach, Israel. Playtika's common stock trades on the Nasdaq Stock Market under the symbol "PLTK."

### 2.     Individual Defendants

14.     Defendant Robert Antokol ("Antokol") co-founded Playtika in 2010, has served as Chief Executive Office ("CEO") of the Company since inception, and Chair of the Board since 2020. As of April 12, 2022, Antokol owns 11,613,700 Playtika shares, giving him 2.8% of the Company's voting control. Since 2021, the Company paid Antokol the following compensation:

| YEAR | SALARY | BONUS | STOCK AWARDS | NON-EQUTIY INCENTIVE PLAN COMPENSATION | ALL OTHER COMPENSATION | TOTAL |
|------|--------|-------|--------------|----------------------------------------|------------------------|-------|
| 2021 | $399,845 | $35,033,472 | N/A | $26,388,526 | $1,301,626 | $63,123,469 |
| 2020 | $376,190 | 16,861,891 | $310,414,910 | $44,074,722 | $280,463 | $372,008,176 |

15.     Defendant Marc Beilinson ("Beilinson") is a Playtika director since 2020. He is the Chair of its Audit Committee and a member of the Nominating and Corporate Governance Committee. As of April 12, 2022, Beilinson owns 24,521 Playtika shares. In 2021, he received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|------|------------------------------|--------------|-------|
| 2021 | $110,000 | $299,066 | $409,066 |

16.     Defendant Tian Lin ("Lin") is a Playtika director since 2016. Lin served as the head of investment at Giant Network Group Co., Ltd. ("Giant Network Group") from January 2016 until January 2021 and led Giant Network Group's acquisition of Playtika in 2016. As of April 12, 2022, Lin owns 15,262 Playtika shares.

17.      Defendant Bing Yuan ("Yuan") is a Playtika director since 2020. He is the Chair of its Nominating and Corporate Governance Committee and is a member of the Compensation Committee and Audit Committee. Yuan is a managing director and the Chief Operating Officer ("COO") of Hony Capital, a private equity firm, which is an investor in Giant Network Group and was part of the consortium, led by Giant Network Group, that purchased Playtika in 2016.[1] Yuan joined Hony Capital in April 2009 and has served as a managing director since January 2010. As of April 12, 2022, Yuan owns 24,521 Playtika shares. In 2021, Playtika paid Yuan the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|------|------|------|------|
| 2021 | $95,000 | $299,806 | $394,066 |

18.      Defendant Hong Du ("Du") is a Playtika director since January 2022. She is a member of the Compensation Committee. She is SINA Corporation's Co-President and COO since 2013.

19.      Defendant Dana Gross ("Gross") is a Playtika director since 2022. She is a member of its Audit Committee. As of April 12, 2022, Gross owns 15,262 Playtika shares.

20.      Defendant James Fu Bin Lu ("Lu") is Playtika director since July 2022. Lu was the founding partner of Joffre Capital Limited ("Joffre Capital") and is a member of the board of directors.

## IV.   THE INDIVIDUAL DEFENDANTS' DUTIES

21.      By reason of their positions as officers or directors of Playtika and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants

---

[1]      Eli Binder, *The Playtika Prize*, *The Wire China*, January 17, 2021, https://www.thewirechina.com/2021/01/17/the-playtika-prize/.

owed and owe Playtika and its shareholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Playtika in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Playtika and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

22.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Playtika, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

23.     As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on the Nasdaq, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning Playtika's financial condition, operations, products, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information. In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over Playtika's management, policies, and internal controls.

24.     At all times relevant hereto, the Individual Defendants were the agents of each other and Playtika and were always acting within the course and scope of such agency.

25.     The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Playtika.

A.      **Duties Under Playtika's Code Of Business Conduct And Ethics**

26.      Playtika's Code of Business Conduct and Ethics ("Code of Conduct") applies to all "directors, officers and employees of the Company and its controlled affiliates."

27.      The Code of Conduct's purpose is to promote, among other things:

- honest and ethical conduct, including fair dealing and the ethical handling of actual or apparent conflicts of interest;
- full, fair, accurate, timely and understandable disclosure;
-  compliance with applicable governmental laws, rules, and regulations;
- prompt internal reporting of any violations of law or the Code of Conduct; and
- protection of the Company's business interests, including its assets and corporate opportunities.

28.      The Code of Conduct discusses the importance of arms-length dealings with third parties:

> Each Covered Party should endeavor to deal fairly with fellow employees and with the Company's customers, service providers, suppliers and competitors. No Covered Party should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice.

29.      The Code of Conduct discusses the importance of clear, concise, truthful, and accurate record-keeping:

> All financial books, records and accounts must accurately reflect transactions and events, and conform both to generally accepted accounting principles (GAAP) and to the Company's system of internal controls. No entry may be made that intentionally hides or disguises the true nature of any transaction. Covered Parties should therefore attempt to be as clear, concise, truthful and accurate as possible when recording any information.

30.      The Code of Conduct stresses that all "suspected violations of laws, rules, regulations or the Code [of Conduct]" should be "promptly report[ed]" to "appropriate personnel, including officers, the General Counsel, and the Board or the relevant committee thereof."

31.     The Code of Conduct mandates full, fair, accurate, timely, and understandable disclosures:

> The information in the Company's public communications, including in all reports and documents filed with or submitted to the U.S. Securities and Exchange Commission, must be full, fair, accurate, timely and understandable.

> To ensure the Company meets this standard, all Covered Parties (to the extent they are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with their duties. Covered Parties are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others….

32.     The Code of Conduct places additional obligations on the Company's senior financial officers, including, but not limited to, Defendant Antokol, to "promote compliance by all employees with the Code [of Conduct] and to abide by Company standards, policies, and procedures."

**B.      Additional Duties Under The Corporate Governance Guidelines**

33.     The Company's Corporate Governance Guidelines place further obligations on the Board regarding risk management:

> [T]he Board and the Board committees shall have an active role in overseeing management of the Company's risks. The Board shall regularly review information regarding the Company's credit, liquidity and operations, as well as the risks associated with each …. While each committee shall be responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through committee reports about such risks.

**C.      Additional Duties Of Audit Committee Members**

34.     The Audit Committee Charter sets forth additional duties for members of the Audit Committee and provides that members are obligated to assist the Board in its oversight of, among other things, the integrity of the Company's financial statements; the Company's compliance with legal and regulatory requirements; and the design, implementation, and performance of the Company's internal audit function.

35. The Audit Committee has obligations regarding risk management, including discussing "the Company's policies with respect to risk assessment and risk management" to ensure their effectiveness.

36. The Audit Committee "must periodically consider and discuss with management and the independent auditor the Company's Code [of Conduct] and the procedures in place to enforce" it.

37. The Audit Committee is also obligated to oversee and monitor significant operating and control issues:

- The Committee must discuss the Company's earnings press releases, conference call scripts and related documentation, as well as financial information and earnings guidance provided to analysts and rating agencies.

- The Committee must establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

- The Committee shall periodically review the Company's policies and procedures for reviewing and approving or ratifying related person transactions.

**D.    Additional Duties Of Nominating And Corporate Governance Committee Members**

38. The Charter of the Nominating and Corporate Governance Committee sets forth additional duties for its members, including obligations relating to overseeing the development and adequacy of the Corporate Governance Guidelines: "The Committee will develop and recommend to the Board the Corporate Governance Guidelines. The Committee will, from time to time as it deems appropriate, review and reassess the adequacy of the Corporate Governance Guidelines and recommend any proposed changes to the Board for approval."

## V.   SUBSTANTIVE ALLEGATIONS

### A.   Background

39.     Playtika is a digital entertainment company that specializes in the development and publication of mobile casino games co-founded in 2010 by Defendant Antokol.

40.     In September 2011, Playtika released its first mobile game, *Slotomania*, which was highly successful.[2]

41.     In May 2011, the Company was bought by Caesars Interactive Entertainment, Inc.

42.     Over the next several years, Playtika focused on acquiring studios and their games, rather than developing its games in-house. Beginning in 2011, Playtika began executing on this strategy, purchasing several games over the next few years, including another one of its most popular games, *Bingo Blitz*.

43.     In 2016, Playtika was acquired by a consortium of private Chinese companies led by Giant Investment Co., Inc., a venture capital firm affiliated with Giant Network Group, for $4.4 billion.[3]

44.     On January 15, 2021, Playtika launched its IPO, pursuant to a Prospectus on Form 424B4 and previously filed Registration Statement (collectively, the "Offering Materials") signed by Defendants Antokol, Beilinson, Yuan, and Lin.

45.     In the IPO, the Company offered 18,518,500 common shares and the selling stockholder, Playtika Holding UK II Limited, ("PHUK II"), which is controlled by Giant Network

---

[2]     In January 2022, *GameRefinery*, a popular gaming news site, reported that *Slotomania* had the biggest market share and was the top game in the slots subgenre on iOS. Andrea Knezovic, *Slotomania Analysis: How Playtika Keeps Hitting the Jackpot, Udonis,* January 16, 2022, https://www.blog.udonis.co/mobile-marketing/mobile-games/slotomania-analysis.

[3]     Dean Takahashi, *Venturebeat*, July 30, 2016, https://venturebeat.com/business/chinas-giant-leads-consortium-to-buy-playtika-for-4-4-billion/.

Group, sold 50,981,500 common shares at $27.00 per share. Following the offering, PHUK II continued to own approximately 79.8% of the voting power of Playtika's outstanding capital stock, making Playtika a "controlled company."

46.     The Offering Materials disclosed an Equity Plan Stockholders Agreement under which certain shareholders, including Defendant Antokol, gained certain "piggyback" registration rights:

> We are party to an equity plan stockholders agreement with our controlling stockholder Playtika Holding UK II Limited, Alpha Frontier Limited, Giant Network Group Co., Ltd., Giant Investment Co., Ltd., Playtika Holding UK Limited, Chongqing Cibi, Hazlet Global Limited and Equal Sino Limited, as well as Mr. Antokol, Chief Executive Officer and Chairperson of the Board, Mr. Abrahams, our President and Chief Financial Officer … and certain other non-executive officer members of management of the Company (such, individuals, the "Employee Stockholders").
>
> ***
>
> The equity plan stockholders agreement provides for certain "piggyback" registration rights for the benefit of the Employee Stockholders, which will survive the completion of this offering. The registration rights terminate on the fifth anniversary of the effective date of the registration statement in connection with this offering.

B.     *Slotomania* And *Bingo Blitz* Are Central To Playtika's Growth, Accounting For Half Of The Company's Total Revenues

47.     In the Offering Materials, Playtika disclosed that *Slotomania*, Playtika's "first and largest title" accounts for a "significant portion" of the Company's revenue. According to the Company, "*Slotomania* has been a staple in the U.S. mobile games market and has been a top 10 grossing mobile game in each of the last 8 years."

48.     The Offering Materials note that *Slotomania* placed the Company at the forefront of the gaming industry: "Our first game, *Slotomania*, gathered traction almost immediately, making us a category leader."

12

49.     The Offering Materials also stressed the importance of *Bingo Blitz,* calling it the "#1 game worldwide in mobile bingo-themed genre."

50.     According to a revenue chart in the Offering Materials, *Slotomania* and *Bingo Blitz* brought in $724 million,[4] and $417 million in revenue in fiscal year 2020, respectively, which means the revenue from the two games *nearly equaled* the combined revenue from Playtika's other games. Based on these numbers, *Slotomania* generated approximately 32% of an overall revenue of $2.3 billion in 2020 and *Bingo Blitz* generated approximately 18.2% of overall revenue.

51.     The Company highlighted the enormous revenue from these two top-grossing games in 2018 and 2019 as well: "For example, for the years ended December 31, 2018 and 2019, our top two games by revenue, *Slotomania* and *Bingo Blitz*, collectively generated more than half of our revenues for each period."

### C.     The Individual Defendants Knew The Material Risks Regarding Playtika's Core Operations

52.     In the Offering Materials and subsequent public filings, the Company disclosed the risks connected to Playtika's business model, such as the Company's dependence on its two most popular games and its ability to consistently enhance and improve upon those games:

> Our business is dependent on the success of a limited number of games and on our ability to consistently enhance and improve upon games that achieve significant popularity. Historically, we have depended on such games for a majority of our revenues and we expect that this dependency will continue for the foreseeable future. For example, for the years ended December 31, 2018 and 2019, our top two games by revenue, *Slotomania* and *Bingo Blitz*, collectively generated more than half of our revenues for each period.

53.     The Offering Materials discussed the risks associated with attracting and retaining users by constantly upgrading and enhancing Playtika's games and their features: "For a game to

---

[4]     In 2017, *Slotomania* accounted for $514 million of the $1.151 billion of revenues, or 44.66%.

remain popular and to retain players, we must constantly enhance, expand and upgrade the game with new features, offers, and content that players find attractive." As a result, each of Playtika's games requires "significant product development, marketing and other resources to develop, launch and sustain popularity through regular upgrades, expansions and new content, and such costs on average have increased over time." A failure to attract and retain players would result in damage to Playtika's "market share and reputation" and "a material adverse effect on [the Company's] business, financial condition and results of operations."

54.     The Offering Materials noted that a "small percentage of users have generated a majority" of Playtika's revenues:

> Revenues of free-to-play games typically rely on a small percentage of players who spend moderate or large amounts of money in games to receive special advantages, levels, access and other features, offers, or content. The vast majority of users play for free or only occasionally spend money in games …. For example, for the nine months ended September 30, 2020, our average Daily Payer Conversion was 2.5%.

55.     The Offering Materials disclosed the risks from the Company's dependency on virtual purchases: "Our games are available to players for free, and we generate nearly all of our revenues from the sale of virtual items…. For example, in each of the nine months ended September 30, 2019 and 2020, we derived 97.7% and 97.2%, respectively, of our revenues from in-game purchases."

56.     The Company further disclosed the risks of operating in a highly competitive, constantly evolving industry: "The mobile gaming industry is a rapidly evolving industry with low barriers to entry…. As a result, we are dependent on our ability to successfully compete against a large and growing number of industry participants," and stressed the need to adopt and utilize new technologies, as the "industry is constantly changing games and business models in order to adopt and optimize new technologies, increase cost efficiency and adapt to player preferences."

14

57.     Further, the Offering Materials repeated how critical the introduction of updated content and features was to Playtika's business model:

> The most successful free-to-play games require the consistent introduction of new content, offers, and features, a highly quantitative approach to managing in-game economies, and a design that is both engaging either as a primary source of entertainment or as a second screen.
>
> ***
>
> Through our dedication to providing new content, feature optimization and customization....
>
> ***
>
> Our revenue growth has been driven by ***improving the content, offers, and features[5]*** in our existing games and the release or acquisition of new games. In order to enhance the content, offers, and features in our existing games and to develop or acquire new games, we must invest a significant amount of our technological and creative resources, ensuring that we support a ***consistent cadence of novel content creation*** that drives conversion and continued monetization.

58.     The Offering Materials emphasize the importance of a "constant cadence" of new content:

> Throughout the lifecycle of our games, we dedicate substantial operational resources and team members to support a constant cadence of novel content and feature creation that drives conversion and continued monetization. Five of our games currently rank as the #1 grossing game in their respective genre worldwide, based on total in-app purchases on iOS App Store and Google Play Store worldwide for the nine months ended September 30, 2020, according to App Annie.

59.     The Offering Materials discusses the risks in connection with Playtika Holding UK II Limited's majority stake in the Company, which shares are controlled by the founder of Giant Network Group:

> Following the completion of this offering, Yuzhu Shi will continue to control shares representing a majority of our combined voting power through his indirect interest in Playtika Holding UK II Limited, or Playtika Holding UK. Immediately after this offering, Playtika Holding UK will own approximately 79.8% of our total outstanding shares of common stock. As long as Yuzhu Shi continues to control shares representing a majority of our voting power, he will generally be able to

---

[5]     All emphasis herein is added unless otherwise stated.

determine the outcome of all corporate actions requiring stockholder approval, including the election and removal of directors…. Investors in this offering will not be able to affect the outcome of any stockholder vote….

**D.    The Individual Defendants Represent That The Company Is Dedicated To Supporting A "Constant Cadence" Of Novel Content**

60.    The Offering Materials emphasized that the key to growth in the industry was "the consistent introduction of new content, offers, and features," and using *Slotomania* and *Bingo Blitz* as an example, noted the importance of constantly enhancing, expanding, and upgrading a game "with new features, offers, and content that players find attractive."

61.    The Offering Materials represented that the Company "dedicate[s] substantial operational resources and team members to support a ***constant cadence of novel content and feature creation that drives conversion and continued monetization***," and invests a "significant amount of our technological and creative resources, ensuring that we support a consistent cadence of novel content creation." According to the Offering Materials, the Company was frequently introducing "new features, offers and content" to "enhance the overall player experience."

62.    The Offering Materials further noted that the Company has a "fundamentally different approach to operating games," by operating its games as "platforms that users can interact with for decades," by providing a "constant flow of new content that is highly personalized to users based on their gameplay behavior." The Company explained "we seek to generate increased value on a per player basis by continuously optimizing our content to drive user engagement and retention."

63.    The Offering Materials touted the expertise of Playtika in "creating features and player experiences that optimize player engagement," with a focus on continuing to "implement and enhance features that keep games fresh and increase user engagement …." The Company noted that 40% of its staff was employed in research and development. The focus on research and

16

design allowed the Company to "consistently introduce **updates and enhancements to our games on a daily, sometimes hourly, basis,**" and the frequent content and feature updates provided "highly tailored experiences to users." The Offering Materials discussed the automation of certain quality assurance procedures, which "**significantly increased the frequency with which we are able to deploy new content and features for those games, allowing us to create and deploy more content quicker to enhance monetization**."

64.     The Offering Materials pointed to Playtika's large number of monthly active users which allowed the Company to focus on "creating innovative content, features, and experiences:" "[W]ith 35.2 million average MAUs for the nine months ended September 30, 2020, we are able to use our scale to gain significant insight into the operations of our games and refine **and implement effective strategies with respect to feature innovation, content cadence**…."

65.     The Offering Materials stated that revenue increased by $398.6 million for the nine months ended September 30, 2020, compared to the same period in the prior year due to the acquisition of a new game and "our ongoing improvements to monetization, new content and product features and increased engagement across our broader portfolio of games," which ultimately resulted in an increase in payer conversion.

66.     The Company also disclosed in the Offering Materials that it had increased "average Daily Payer Conversion from 2.1% for the nine months ended September 30, 2019 to 2.5% for the nine months ended September 30, 2020, an increase of 19.0%" because of its dedication to "providing new content, feature optimization and customization," and announced an intention to "continue to explore new strategies to improve our conversion of users into paying users, including continued game enhancements…."

67.     In a CNBC interview on the day after the IPO, Defendant Antokol stated that the Company viewed its games as a "platform" and was focused on the long-term. Antokol touted the fact that the Company was "stable and growing," and was largely a "technology company" with an emphasis on "data," which put out "fresh content every week, every two weeks."[6]

68.     On May 11, 2021, the Company filed with the SEC a Current Report on Form 8-K attaching a press release announcing first quarter financial results and providing guidance for 2021. The press release stated that "the company anticipates revenue of $2.6 billion and Adjusted EBITDA of $1.0 billion, up from our prior guidance of $2.44 billion and $920 million."

**E.     Playtika And The Individual Defendants Report Decreased Revenue And Missed Guidance**

69.     On November 3, 2021, Playtika filed with the SEC a Current Report on Form 8-K attaching a press release announcing its third-quarter financial results. In the press release, Playtika reported revenues of $636 million, down from the $659.2 million reported in the previous quarter, which missed analyst expectations of $664 million. The Company revised its full-year guidance, downward to $2.57 billion, down from the $2.6 billion guidance provided less than six months earlier, and revised its full year adjusted EBITDA guidance to $980 million, down from the $1 billion guidance provided less than six months earlier.

70.     In the press release, Defendant Antokol and Craig Abrahams ("Abrahams"), Playtika's President and Chief Financial Officer, referenced "infrastructure and product investments," which set the Company up for success. Antokol stated that the "third quarter presented opportunities for us to make product investments and set the stage for growth in 2022 and beyond." Abrahams commented: "We are confident that the infrastructure and product

---

[6]     https://www.cnbc.com/video/2021/01/15/playtika-ceo-and-co-founder-robert-antokol-on-its-ipo.html.

investments made in Q3'21 will allow us to drive sequential growth across our portfolio into 2022."

71.     On an earnings call with investors and securities analysts that same day, Defendant Antokol touted the Company's expertise in "data analytics, gamification, monetization, technology and integration" and stated that "[o]ur focus in the long-term health of our business and the step[s] we have taken this year, put[s] us [on] firm footing to win and lead in the long-term."

72.     Abrahams admitted that the Company was offering *fewer features* on its top grossing games, unlike the representations in the Offering Materials and Defendant Antokol's interview that the Company was constantly offering new features and content.

73.     Ultimately, Abrahams disclosed that the Company had done a complete coding overhaul for *Slotomania*: "[W]e also rewrote the client from the ground up moving Slotomania from C Sharp to Java Script. This was the culmination of an 18-month project…." The length of the coding project means that the Individual Defendants knew, between ***nine months to a year before the IPO***, that the Company would not be able to continue to provide the same level of content and features for *Slotomania* as in the past because the majority of the studio's resources were dedicated to changing the programming language.

74.     Abrahams also announced the "total revamping of the Bingo Engine, the first step in preparing *Bingo Blitz* for the next decade. Looking ahead, we're working on a complete brand facelift including refreshing the lobby, map, logo payment page and many other aspects of the game…[including] features that will enhance the social experience even further."

75.     Abrahams indicated that because of the infrastructure overhaul, Playtika's performance in the fourth quarter would also be affected:

In terms of the broader portfolio, we guided the back half of the year to be flat because we saw comparatively fewer new promotions and features as a result of some of ***the infrastructure enhancements*** we're making…. ***And that does impact our fourth quarter***, and that we still have some of those infrastructure investments that permeate through the fourth quarter as well. And so that's why the guidance for the fourth quarter is consistent with the third.

76.     Following the announcement of the infrastructure overhaul of the Company's top grossing games and the missed guidance, Playtika's stock dropped more than 23% on November 3rd, falling from $29.52 per share to close at $22.72 per share, wiping out nearly one-fourth of the Company's equity value.

77.     On January 27, 2022, Playtika filed with the SEC a Current Report on Form 8-K attaching a joint press release from the Company and its largest shareholder, Playtika Holding UK II Limited. In the press release, the Company reported that Playtika Holding UK II Limited was planning on selling approximately 15-25% of its Playtika shares. Following the report, the Company's stock dropped by 15%.

78.     On May 10, 2022, Playtika filed with the SEC a Current Report on Form 8-K attaching a press release announcing its first quarter financial results. In the press release, the Company reported revenue below analyst expectations for the quarter, 676.9 million versus $679.0 million, and provided guidance for revenue below analyst expectations, $2.73 billion vs. $2.82 billion.[7]

79.     On June 28, 2022, PHUK II, controlled by Yuzhu Shi, sold its 20% stake in Playtika to private equity firm Joffre Capital, headed by Defendant James Lu, who subsequently joined the Board, at an $8.5 billion company valuation.

---

[7]     Tomi Kilgore, *Playtika Stock Falls after Revenue Comes up Shy, Full-Year Outlook is Below Expectations MarketWatch*, May 10, 2022, https://www.marketwatch.com/story/playtika-stock-falls-after-revenue-comes-up-shy-full-year-outlook-is-below-expectations-2022-05-10.

### F.     Playtika Is Sued In A Securities Class Action

80.     On November 23, 2021, a securities class action lawsuit was filed in the United States District Court for the Eastern District of New York against the Company, Defendants Antokol, Beilinson, Yuan, and Lin, CFO Abrahams, other Playtika officers, and the underwriters of the Company's IPO captioned *Bar-Asher v. Playtika Holding Corp., et al.*, No. 1:21-cv-06571-RPK-SJB (E.D.N.Y.), alleging violations of Sections 11 and 15 of the Securities Act of 1933.

81.     On May 6, 2022, an amended complaint was filed (the "Amended Securities Complaint"). The Amended Securities Complaint seeks damages on behalf of all persons and entities who purchased or otherwise acquired Playtika common stock pursuant or traceable to Playtika's January 2021 IPO. The plaintiff asserts that the defendants made false and misleading statements and omissions in the Company's IPO Registration Statement which gave the impression that there were no undisclosed material risks to Playtika's ability to continue rolling out product features on a "constant cadence."

### G.     Confidential Witnesses In The Securities Class Action[8] Disclose The Impact Of The Significant Changes To Playtika's Top Grossing Games

#### 1.     *Slotomania* Code Migration

82.     Several former employees of the Company revealed that Playtika underwent material infrastructure changes that had a substantial impact on the Company. For example, CW1, a former research and design manager at Playtika from before 2018 until mid-to-late 2021, explained that the migration from C-Sharp to JavaScript in *Slotomania* was "very complicated."

---

[8]     While Plaintiff and its undersigned attorneys have conducted their own independent investigation of the wrongdoings alleged herein, the Confidential Witness ("CW") allegations herein are based upon allegations contained in the Amended Securities Complaint. Regardless of gender, all CWs will be described in the masculine as in the Amended Securities Complaint.

83.    CW3,[9] who worked at *Slotomania* before the IPO and was involved in migrating the game from web browsers onto social media platforms, stated that changing the code in *Slotomania* to JavaScript would take at "least a year."

84.    CW1 noted that the transition to JavaScript was intended to save money and reduce the number of employees needed to work on at a specific gaming studio,[10] which translated into less people available to work on new features and content because *Slotomania* personnel were focused on the migration to the new code.[11] CW-2[12] reported that, to create product features, a "task force" was developed for each feature. Further, any new features and content would need to be written in the new programming language which would take more time because the developers would have to learn or familiarize themselves with the new programming code.[13] CW4, a former Playtika Software Engineer who left the Company in the summer of 2021, confirmed that any new features would need to be written in the new programming language and that a migration to a new programming language was "very complex."[14]

85.    CW4 further noted that Playtika games were made up of a series of small parts and each part needed to be rewritten in the new code, consequently designing new features for

---

[9]    CW3 is a former Playtika Software Engineer from the end of 2017 until the first quarter of 2020.

[10]    CW1 explained that each gaming studio operates independently with its own staff.

[11]    *Id.* at ¶ 150 (d)-(f).

[12.]    CW2 is a former UI/UX Playtika designer from the IPO until the summer of 2021.

[13]    *Id.* at ¶ 151.

[14]    *Id.* at ¶¶ 141; 151 (b); *see also* David J. Lumb, *The ABCs of Language Migration*, *Increment*, https://increment.com/programming-languages/language-migration/ (last visited on Sept. 22, 2022) ("noting that it could take two years, or three years, or even six, to see the impact [of code migration.").

*Slotomania* would be difficult for any developer.[15] This complex task was further complicated by the fact that *Slotomania* was accessed and operated on third-party platforms such as Apple, Facebook, and Google. Therefore, Playtika personnel had to ensure that all interactions between *Slotomania* and the third-party platforms were integrated seamlessly after changing the programming language within the game itself.[16]

### 2. *Bingo Blitz* Overhaul

86.    CW1 stated that the overhaul of *Bingo Blitz* would have decreased the introduction of new features by at least "5-10%" and stated that "was the plan," meaning that the Individual Defendants knew that there would be a significant reduction in the introduction of new features in *Bingo Blitz* based on the infrastructure change.[17]

87.    CW1 explained that devoting resources to the redesign of the game prevented developers from designing new features. Further, the features needed to be "matched" with the new user interface, and a UI redesign needs "A/B testing"[18] and is "complicated in terms of analytics." Playtika would first test a design choice on a small portion of users before rolling out to the broader population, which was time-consuming and used up resources.[19] CW2, a UI/UX designer, confirmed this lengthy, complicated process.

---

[15]    *Id.* at ¶ 151(c)-(d).

[16]    *Id.* at ¶ 152 (b).

[17]    *Id.* at ¶ 169.

[18]    A/B testing is a way for developers to conduct a controlled experiment using two groups of users to make design decisions.

[19]    *Id.* at ¶¶ 174-75 (a)-(b).

88.     The overhaul of *Bingo Blitz* also presented the risk that many users would leave the game based on the new interface, which is common when a game design is altered.[20] According to a *Techopedia* article,[21] users are confronted with "interface whiplash," and "even the smallest alterations often generate confusion - and even anger."

**H.     Playtika's False And Misleading Proxy Statement**

89.     On April 28, 2022, the Company filed its 2022 Proxy Statement with the SEC soliciting shareholder votes to, among other things, re-elect Defendants Antokol, Beilinson, Lin, Yuan, Du, and Gross, to the Board and approve executive compensation. The Proxy Statement was issued by the order of the Board.

90.     The 2022 Proxy Statement represents that the Board oversees and monitors the Company's risk exposures:

> The Board has an active role, as a whole and also at the committee level, in overseeing the management of our risks. The Board is responsible for general oversight of risks and regular review of information regarding our risks, including credit risks, cybersecurity risks, liquidity risks and operational risks…. Although each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire board of directors is regularly informed through discussions from committee members about such risks. The Board believes its administration of its risk oversight function has not negatively affected the Board's leadership structure.

91.     The 2022 Proxy Statement represents that the Company has robust corporate governance in place based on the ethical standards and expertise of the Board:

> We believe that all of our director nominees have a reputation for integrity, honesty, and adherence to high ethical standards. They each have demonstrated business acumen and an ability to exercise sound judgment, as well as a commitment of service to Playtika and the Board. We also value the additional perspective that

---

[20]     *Id.* at ¶ 176 (a).

[21]     Justin Stoltzfus, *Sudden Interface Changes: Why Disorienting Users Can Hurt,* Nov. 12, 2013, https://www.techopedia.com/2/29586/personal-tech/software-applications/sudden-interface-changes-why-disorienting-users-can-hurt.

comes from serving on other companies' boards of directors and board committees. We continue to review the composition of the Board in an effort to assemble a group that can best perpetuate the success of the business and represent stockholder interests through the exercise of sound judgment using its diversity of experience in various areas.

92. The foregoing statements in the 2022 Proxy Statement were false and misleading and omitted material information. Contrary to the representations made in the Proxy, the Board was required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Playtika's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

93. On June 10, 2022, Playtika filed with the SEC a Current Report on Form 8-K announcing, among other things, the reelection of Defendants Antokol, Beilinson, Lin, Yuan, Du, and Gross, and the approval of executive compensation, pursuant to the solicitations in the 2022 Proxy Statement.

## VI.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

94. Plaintiff brings this action derivatively and for the benefit of Playtika to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Playtika, gross mismanagement, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

95. Playtika is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

96. Plaintiff is, and has been at all relevant times, a stockholder of Playtika and was a stockholder of the Company at the time of the transactions alleged herein. Plaintiff will adequately and fairly represent the interests of Playtika in enforcing and prosecuting its rights, and, to that

end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

97.     Demand upon the Board to institute this action against the Individual Defendants would be futile and is, therefore, excused. The Board is neither disinterested nor independent.

### A.     Demand Upon Defendant Antokol Is Excused

98.     Defendant Antokol has served as CEO of Playtika since its inception and Chair of the Board since 2020. Defendant Antokol therefore is not independent. Indeed, Playtika's 2022 Proxy Statement does not list Antokol as an independent director.

99.     As an employee of Playtika, the Company provides Defendant Antokol with his principal occupation from which he receives substantial compensation, including $63,123,469 in 2021 and $372,008,176 in 2020. Thus, Antokol could not consider a demand for action that might require him to sue the directors who control his continued employment or fellow members of management with whom he works on a day-to-day basis.

100.     Antokol will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of April 12, 2022, Antokol beneficially owns 11,613,700 Playtika common shares, giving him 2.8% of the Company's voting control. If Antokol acknowledged that he, Playtika, or others engaged in misconduct, his investment in Playtika would be substantially devalued and his lucrative position jeopardized. Further, if Antokol acknowledged that executives at Playtika had engaged in the wrongdoing alleged, he would be acknowledging that he, as CEO of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

101.    Defendant Antokol is named as a defendant in the pending Securities Class Action. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

102.    Antokol authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

103.    Antokol benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Playtika Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

104.    Antokol has a business relationship with Defendant Lin which precludes him from acting in an independent and disinterested manner. Antokol oversaw the sale of Playtika from Caesars Interactive Entertainment, Inc. to a consortium of investors led by Giant Network Group Co., Ltd.  Defendant Lin served as the head of investment at Giant Network Group from January 2016 until January 2021 and led Giant's acquisition of Playtika in 2016.

105.    Antokol, as a director of Playtika, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Playtika's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

106.    Antokol is neither disinterested nor independent. Any demand upon Defendant Antokol is futile and, thus, excused.

**B.      Demand Upon Defendant Beilinson Is Excused**

107.    Beilinson received $409,066 in 2021 in compensation in the form of fees and stock and option awards for his service as a director in 2021. Beilinson earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a mid-cap company like Playtika[22] is $236,000, thus Beilinson earned 73% more than the average director.

108.    Defendant Beilinson will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of April 12, 2022, Beilinson held 24,521 shares of Playtika common stock. If Beilinson admitted that he, Playtika, or others engaged in misconduct, his investment in Playtika would be substantially devalued. Further, if Beilinson acknowledged that executives at Playtika had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

109.    Defendant Beilinson is named as a defendant in the pending Securities Class Action. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

110.    Beilinson authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

---

[22]    The FW Cook survey defines a mid-cap company as one with a market capitalization of between $2 billion and $10 billion.

111.   Beilinson benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Playtika Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

112.   Beilinson, as a director of Playtika, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Playtika's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

113.   Beilinson, as Chair of the Audit Committee, had duties regarding oversight of the risks facing the Company and Playtika's compliance with relevant laws, rules, and regulations. Beilinson utterly failed to perform these essential duties.

114.   Beilinson failed to uphold his additional obligations as a member of the Nominating and Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

115.   Beilinson is neither disinterested nor independent. Any demand upon Defendant Beilinson is futile and, thus, excused.

**C.   Demand Upon Defendant Lin Is Excused**

116.   Defendant Lin will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of April 12, 2022, Lin held 15,262 shares of Playtika common stock. If Lin admitted that he, Playtika, or others engaged in misconduct, his investment in Playtika would be substantially devalued. Further, if Lin acknowledged that executives at Playtika had engaged in the wrongdoing alleged, he would be

acknowledging that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

117.    Defendant Lin is named as a defendant in the pending Securities Class Action. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

118.    Lin authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

119.    Lin benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Playtika Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

120.    Lin served as the head of investment at Giant Network Group from January 2016 until January 2021 and led Giant Network Group's $4.4 billion acquisition of Playtika in 2016. According to the 2022 Proxy Statement, as of April 12, 2022, Giant Network Group currently controls 213,082,594 Playtika common shares through its affiliates, with a total voting power of approximately 56%. If Lin acknowledged that he, Playtika, or others engaged in misconduct, Giant Network Group and its affiliates' investment in Playtika would be devalued, it would undermine Lin's credibility, and damage his business reputation.

121.    Lin has a business relationship with Defendant Antokol through his work at Giant Network Group which precludes him from acting in an independent and disinterested manner. Defendant Antokol oversaw the sale of Playtika from CIE to a consortium of investors led by Giant Network Group.

122.    Lin, as a director of Playtika, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with

all laws, rules, and regulations governing Playtika's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

123.    Lin is neither disinterested nor independent. Any demand upon Defendant Lin is futile and, thus, excused.

**D.    Demand Upon Defendant Yuan Is Excused**

124.    Yuan received $394,066 in 2021 in compensation in the form of fees and stock and option awards for his service as a director in 2021. Yuan earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a mid-cap company like Playtika is $236,000, thus Yuan earned 67% more than the average director.

125.    Defendant Yuan will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of April 12, 2022, Yuan held 24,521 shares of Playtika common stock. If Yuan admitted that he, Playtika, or others engaged in misconduct, his investment in Playtika would be substantially devalued. Further, if Yuan acknowledged that executives at Playtika had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

126.    Defendant Yuan is named as a defendant in the pending Securities Class Action. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

127.    Yuan authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

128.    Yuan benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Playtika Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

129.    Yuan is a managing director and the COO of Hony Capital, a private equity firm. Hony Capital was part of the Chinese consortium that purchased Playtika in 2016.[23] Giant Network Group Co., Ltd., which led the consortium, is a portfolio company of Hony Capital.[24] If Yuan acknowledged that he, Playtika, or others engaged in misconduct, Hony Capital's investment in Giant Network Group would be devalued, it would undermine Hony Capital and Yuan's credibility, and weaken their ability to attract future business.

130.    Yuan, as a director of Playtika, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Playtika's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

131.    Yuan, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Playtika's compliance with relevant laws, rules, and regulations. Yuan utterly failed to perform these essential duties.

---

[23]    Eli Binder, *The Playtika Prize*, *The Wire China*, January 17, 2021, https://www.thewirechina.com/2021/01/17/the-playtika-prize/.

[24]    Hony Capital website, https://www.honycapital.com/investEnterprise_en/index.aspx?nodeid=2049.

132.    Yuan failed to uphold his additional obligations as Chair of the Nominating and Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

133.    Yuan is neither disinterested nor independent. Any demand upon Defendant Yuan is futile and, thus, excused.

**E.    Demand Upon Defendant Du Is Excused**

134.    Du authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

135.    Du benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Playtika Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

136.    Du, as a director of Playtika, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Playtika's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

137.    Du is neither disinterested nor independent. Any demand upon Defendant Du is futile and, thus, excused.

### F.  Demand Upon Defendant Gross Is Excused

138.    Defendant Gross will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm her and her investments. As of April 12, 2022, Gross held 15,262 shares of Playtika common stock. If Gross admitted that she, Playtika, or others engaged in misconduct, her investment in Playtika would be substantially devalued. Further, if Gross acknowledged that executives at Playtika had engaged in the wrongdoing alleged, she would be acknowledging that she, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

139.    Gross authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

140.    Gross benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the Playtika Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

141.    Gross, as a director of Playtika, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Playtika's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

142.    Gross, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Playtika's compliance with relevant laws, rules, and regulations. Gross utterly failed to perform these essential duties.

143.    Gross is neither disinterested nor independent. Any demand upon Defendant Gross is futile and, thus, excused.

**G.    Demand Upon Defendant Lu Is Excused**

144.    Lu was the founding partner of Joffre Capital Limited and is a member of the board of directors. Joffre Capital acquired a 20% minority stake in Playtika for $2.2 million in June 2022. Therefore, Lu cannot consider a demand to take action against the other members of the Playtika Board with the required disinterest and independence because it would jeopardize Joffre Capital's investment in Playtika, damage Lu and Joffre Capital's credibility, and weaken their ability to attract future business.

145.    Lu, as a director of Playtika, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Playtika's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

146.    Lu is neither disinterested nor independent. Any demand upon Defendant Lu is futile and, thus, excused.

**H.    Other Factors Demonstrating That Demand
        Upon The Individual Defendants Is Excused**

147.    Playtika has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

148.    The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board.

They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

149.    Publicly traded companies, such as Playtika, typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover Playtika's damages.

## VII.    CLAIMS FOR RELIEF

**COUNT ONE**
**Against the Individual Defendants for**
**Violations of Section 14(a) of the Exchange Act**

150.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

151.    The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

152.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

153.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

154.    The 2022 Proxy Statement was materially false and misleading because the Individual Defendants were required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Playtika's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

155.    The misleading information contained in the 2022 Proxy Statement was material to Playtika shareholders in determining whether to elect each of the Individual Defendants to the Board and approve the executive compensation.

156.    The material misstatements and omissions in the 2022 Proxy Statement damaged the Company.

157.    Plaintiff, on behalf of Playtika, seeks relief for damages inflicted upon the Company based on the misleading 2022 Proxy Statement in connection with the improper election of the members of the Board and the approval of the executive compensation.

**COUNT TWO**
**Against the Individual Defendants**
**for Breach of Fiduciary Duties**

158.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

159.    The Individual Defendants owed and owe fiduciary duties to Playtika. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Playtika the highest obligation of good faith and loyalty in the administration of Playtika's affairs, including assuring that Playtika complied with state and federal laws governing, among other things, the making of truthful, complete, and accurate public statements regarding the Company's financial condition and business prospects. The Board also had specific duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Playtika alleged herein.

160.    The Individual Defendants ignored their duties. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

161.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned, and abdicated their responsibilities and duties regarding prudently managing the business of Playtika in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of Playtika's affairs and in the use and preservation of Playtika's assets.

162.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Playtika has sustained significant damages, not only monetarily, but

also to its corporate image and goodwill. Such damages include, among other things, the costs of defending and resolving the pending Securities Class Action.

163.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT THREE
### Against the Individual Defendants
### for Contribution and Indemnification

164.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

165.    The Company's alleged liability on account of the wrongful acts and practices, as well as related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Individual Defendants.

166.    The Company has suffered significant and substantial injury as a direct result of the Individual Defendants' actions. Plaintiff, on behalf of the Company, seeks relief from the Individual Defendants on a theory of contribution and indemnity to the extent that the Company is found liable for the Individual Defendants' actions.

## COUNT FOUR
### Against the Individual Defendants
### for Aiding and Abetting

167.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

168.    Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

169.    In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct. They have acted in concert with and conspired

with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

170.   Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein

171.   Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

## VIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Playtika and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants violated Section 14(a) of the Exchange Act;

(c)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Playtika;

(d)   Directing the Company to take all necessary actions to implement and maintain an effective system of internal controls and meaningful Board oversight;

(e)   Determining and awarding to Playtika the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(f)      Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

(g)      Awarding Playtika restitution from the Individual Defendants, and each of them;

(h)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(i)      Granting such other and further relief as the Court may deem just and proper.

## IX.   JURY DEMAND

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: November 4, 2022

**WEISS LAW**

By:  */s/ David C. Katz*
David C. Katz
Mark Smilow
Joshua M. Rubin
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (212) 682-3025
Facsimile:  (212) 682-3010
Email: dkatz@weisslawllp.com
           msmilow@weisslawllp.com
           jrubin@weisslawllp.com

*Attorneys for Plaintiff*

**<u>VERIFICATION</u>**

I, Stephen Bushansky, hereby verify that I have held stock in Playtika Holding Corp. ("Playtika" or the "Company") since the Company's initial public offering. As such, I was a stockholder at the time of the transactions complained of in the Verified Stockholder Derivative Complaint ("Complaint").  I am ready, willing, and able to pursue this stockholder derivative action on behalf of Playtika.  I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true.  Having received a copy of the foregoing complaint, and having reviewed it with my counsel, I hereby authorize its filing.

Stephen. Bushansky (Nov 4, 2022 20:14 EDT)

Stephen Bushansky